**In re SOLAR MFG. CORP.**
(three cases).

**Nos. 11260, 11261 and 11262.**

United States Court of Appeals,
Third Circuit.

Argued May 4, 1954.

Decided Aug. 2, 1954.

As Amended Sept. 1, 1954.

Rehearing Denied Sept. 2, 1954.

Samuel Marion, New York City, for appellant in 11260.

Milton M. Unger, Newark, N. J.(Edward Endelman, New York City, Attorneys and Counsel pro se, on the brief), for appellants in 11261.

Morton Stavis, Newark, N. J. (Samuel M. Koenigsberg, Newark, N. J., on the brief), for appellant in 11262.

William H. Timbers, Washington, D. C. (George Zolotar, New York City, Special Counsel, David Ferber, Special Counsel, Securities and Exchange Commission, Washington, D. C., Ezra Weiss, Indianapolis, Ind., on the brief), for Securities and Exchange Commission.

Samuel M. Coombs, Jr., Jersey City, N. J. (James D. Carpenter, Robert R. Whelan, Jersey City, N. J., on the brief),

for trustee and former trustee and pro se.

Bilder, Bilder & Kaufman, Newark, N. J., and O'Mara, Schumann, Davis & Lynch, Jersey City, N. J., Nathan Bilder, Edward J. O'Mara, Albert Freeman, Frederic W. Schumann, Newark, N. J., on the brief, pro se.

Before GOODRICH, KALODNER and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

This dispute is about fees allowed in a proceeding under Chapter X of the Bankruptcy Act. The record is familiar to us. On prior appeals we have (1) reversed an order approving a sale of the debtor's assets because not included in a plan, 1949, 176 F.2d 493; (2) reversed an order denying a motion to reduce the number of trustees and affirmed an order granting interim allowances, 1951, 190 F.2d 493; (3) affirmed an order, D.C., 102 F.Supp. 859, asserting jurisdiction as to counterclaims against a creditor, 1952, 200 F.2d 327, and (4) vacated an order for final allowances, remanding for further hearings, 1953, 206 F.2d 780. That most recent remand led to a new order allowing the same fees as before. In the present appeals parties dissatisfied with the allowances claim that certain persons, particularly the trustees and their counsel, have received unreasonably large allowances while other parties whose services have benefited the estate have received unreasonably small allowances.

The dissatisfied parties are the appellant Samuel Marion and the appellants Milton Unger and Edward Endelman, all attorneys, who came into the proceeding representing certain holders of debtor's debentures; Morton Stavis, attorney for the debtor's employee creditors; and the Securities and Exchange Commission, appearing in its statutory role as provided in Section 208 of Chapter X, 11 U.S.C.A. § 608. The Commission supports the contention of each of the above named parties that his fee should be increased, though not by as much as each claimant would like. Appellant Marion and the Commission also urge very forcefully that the fees allowed the trustees, their attorneys and certain others are too large.

We consider first the size of the estate and, in broad outline, what its administration has involved. The debtor manufactured electronics equipment. A voluntary petition for reorganization under Chapter X was filed December 14, 1948. The court appointed trustees who continued the business for eight months. However, on August 1, 1949, the debtor's business was discontinued. Activities during the ensuing months resulted in April 1950 in the sale of all of the debtor's assets except cash and causes of action for $815,000. Since April 1950, the responsibilities of the trustees in the administration of the estate, consisting solely of $1,230,000 in cash and claims asserted for and against the debtor, have not been significantly different from incidents of an ordinary bankruptcy administration with attorneys retained to handle both legal routine and contested matters. Progress has been slow. No suit on behalf of the debtor has yet resulted in any substantial addition to the estate. Finally, priority claims against the estate have been paid and general creditors have received 25 percent of their claims. Miscellaneous fees, disbursements and reservations had further reduced the unreserved funds of the estate to about $185,500 when the now contested allowances were made.

The order appealed from has brought the total of fees and allowances approved by the district court to $212,000. An aggregate of $166,000, or about three-fourths of the total allowances has gone to the trustees and their attorneys. Allowances are now stated as final, but only for a period ending November 15, 1952. There is yet to be compensation in connection with the prosecution of pending litigation on behalf of the debtor and presumably supplementary allowances will be claimed for other things which have transpired since November 1952.

When the trustees liquidated the debtor's business the value of the estate was revealed as about a million and a quarter dollars, plus claims of unknown and in 1954 still unascertained value. Fees and allowances have already consumed about 17 percent of the liquidated value. And, the history of this proceeding considered, it is a reasonable assumption that supplementary claims for the period since November 1952, not including counsel fees for pending litigation, will be such as would, if allowed, increase that 17 percent to about 20 percent. Allowances to trustees and their counsel, including these now challenged, have represented about 14 percent of the value of the estate with more to come. On the other hand, general creditors will get little more than 25 percent of their claims, unless pending litigation results in very substantial recovery.

Thus viewed, these allowances seem very high. In Coskery v. Roberts & Mander Corp., 3 Cir., 1952, 200 F.2d 150, where receivers and their counsel had wound up a business and thereafter administered and distributed an estate of about the same value as this one, we held that allowances of $125,000 to receivers and their counsel were "grossly excessive". And we acted in the absence of any complaint that the awards were excessive, the order determining fees having been appealed for a different reason. It is true that the eight month operation of the business here seems to have been a larger task than the winding up of the business in the Coskery case; but not enough larger to make $166,000 in allowances here look any more reasonable here than $125,000 looked there.

Our concern is all the greater when we remember that after the second round of allowances to the trustees—we are now on the fourth—the district court, granting the allowances, admonished that " * * * any subsequent fees or allowances made to the Trustees must of necessity be small." But now that a second judge has exercised his discretion in the granting of further allowances, we find that allowances have more . than

doubled since the quoted warning. At that time the trustees alone had received $41,000. Now they have received $86,-000.

In greater detail, the trustees, John J. McGirl and George Furst, were appointed at the inception of the Chapter X proceeding on December 14, 1948. For convenience we break down their administration into periods, the first covering approximately the calendar years 1949 and 1950. During the first eight months of that period the trustees operated the substantial electronics manufacturing business of the debtors. But there has been no going business since August 1, 1949. From August 1949 to April 1950 there were negotiations and litigation concerning the disposition of the debtor's saleable assets. In April 1950 all assets except cash and causes of action were sold for $815,000. The estate then consisted of about $1,230,000 in cash and, in addition, potential causes of action. Thereafter the administration of the estate involved only the disposition of outstanding claims and causes of action and the distribution of money.

For this first period, 1949 and 1950, the court approved two interim allowances to the trustees aggregating $41,000 divided equally between them pursuant to their petitions for equal amounts, although these same petitions alleged a total of about 3600 hours of work by McGirl and about 2000 hours by Furst. The trustees were, of course, equally responsible for the administration of the debtor's estate and their combined efforts could properly be evaluated as a unit. And they are in no position to complain of equal allowances which they requested.

In these circumstances we attach great significance to the already quoted observation of the District Judge in his opinion of December 28, 1950, approving the second interim allowances, that " * * * any subsequent fees .or allowances made to the trustees must of necessity be small." He also added that the joint allowance of $25,000 then being requested might not be excessive.compensation for

the services rendered but that $16,000 would be granted since full payment was not then being made. Thus, it seems to have been the thinking of the District Judge who was actively supervising the reorganization and had fresh in mind what had been and normally would be required of the trustees that something close to $50,000 would be fair compensation for the entire trusteeship.

This court reviewed and approved the $16,000 interim allowance. At the same time we expressed doubt that we would have made further interim payment to the trustees and added that " * * * we wish to guard against the impression that we have concluded that it is only a small payment on account." And as to what lay ahead we pointed out that " * * There is now no business to run. * * The business, except for distribution of the assets * * * is legal business * * * " 190 F.2d 273, 274. Our conclusion from this is that there was every reason to anticipate, and the trustees were clearly on notice, that no large additional allowances to them beyond the $41,000 already received would be approved either by the district court or this court. Certainly, it was not contemplated that allowances would more than double.

We come now to a second period, the year 1951, ending with the submission and acceptance of the resignations of the trustees in December. At the beginning of this period the Securities and Exchange Commission asked that the number of trustees be reduced from two to one. To us it has seemed clear that soon after the sale of the assets of the business there ceased to be any need for two trustees to administer the cash on hand and to assist counsel with litigation of contested claims. See our opinion in 190 F.2d 273, 274. However, the trustees fought for their plurality all the way to the Supreme Court. Certiorari denied, McGirl v. Minty, 342 U.S. 893, 72 S.Ct. 200, 96 L.Ed. 669. Now it must be accepted as fact and law that there was no justification for two trustees after 1950. We regard this as a limiting factor on any proper allowance of fees.

Beyond this the record of 1951 accomplishments shows that priority claims against the estate were paid, two dividends aggregating 25% were distributed among general creditors, and the trustees advised with counsel from time to time about contested matters. It appears that the trustees maintained an office staff of one, sometimes two, during this period. A considerable part of the time and attention of the trustees was devoted to their efforts to have both of themselves retained in office and their efforts to justify interim allowances. These were matters of concern to them but the work involved was not useful to the estate.

At the end of this period the trustees asked for a further allowance of $25,000 to be divided equally between them. Pending action upon this application a new judge had taken over the supervision of this proceeding. He was confronted with strenuous objections to the requested additional allowances. His predecessor had indicated of record his intention "to examine witnesses, introduce documents and take such other steps as might be required for a full record" on the controversy as to allowances. However, the judge newly coming into the proceeding by an order of April 22, 1952 set up a different procedure which seems to have limited opposing proof to affidavits based upon an examination of the trustees' records to be followed by oral argument. And an affidavit of counsel for the Securities and Exchange Commission states that the court orally directed that the Commission not go forward with an intended taking of depositions on this matter. Thus restricted, the Commission persisted in its objection to anything other than final allowances on full hearing, but to no avail. For the period ending December 1952, the court ordered a further interim allowance of $19,000 divided equally between the trustees.

A third period of this proceeding began in December 1951. On December 3,

1951, the Supreme Court refused to review the decision of this court disapproving the retention of two trustees. A week later the district court accepted the resignation of both trustees and appointed as their successor their attorney, Samuel M. Coombs, Jr. The very reasonable basis for this step is recited in the order of appointment as follows:

"* * * that Samuel M. Coombs, Jr., has been acting as counsel to the trustees since his appointment in that capacity by order of this Court dated November 21, 1949, and that he is familiar with all of the matters now pending, and other matters which will necessarily have to be attended to before the estate of the debtor can finally be wound up * * *"

The action thus taken was in line with the earlier suggestion of this court that the principal remaining business of this reorganization was legal business. It ended a year and a half of largely duplicating services of two or three men when one would have sufficed.

But this economical procedure was soon to be modified. Early in 1952 the new trustee sought authority to employ McGirl, the recent trustee, as his administrative assistant for about two months at a suggested compensation of $75 a day. The Commission vigorously opposed this and at a hearing before a referee sitting as a special master undertook a searching cross examination of the new trustee as to the need for such employment and the course of administration of the estate. But this examination was never completed because it reached a stage where the trustee refused to testify further. The hearing was then adjourned with a view to submitting this impasse to the district court. However, the special master sought to resolve the controversy by submitting a report to the district court recommending the employment of McGirl for ten days only at not more than $75 per day, without reference to the trustee's refusal to testify. This matter came on for hearing before the district court. During this hearing a new proposal was introduced by the court itself when it was suggested from the bench that McGirl be reinstated as trustee and Coombs made counsel again. We find no indication that any party had urged such a course. The Commission objected vigorously to this proposed increase of personnel but the court ordered it nonetheless. Thus, it has come about that McGirl in his claim for final allowances, sets up for a seven month period in 1952 more than 400 hours of work as trustee, as well as more than 100 hours earlier in the year as trustee Coombs' administrative helper, this latter being an employment which seems never to have been approved by anyone in authority.

The more we study the record, the firmer is our conviction that for some thirty months after the sale of the debtor's business the trustees accumulated a record of thousands of hours of work but without commensurate accomplishments or benefits to the estate. The record convinces us not only that there was much duplication in services, but that a very substantial part of the work must have been small matters and office routine uneconomically spread out over long periods of time. In this view we are reinforced by the fact that day after day in listing services performed the trustees have included an item of "executive and administrative work", and miscellaneous conferences on unidentified subjects; and this despite the fact that for long periods of time, pending hearings and pending appeals, administration seems to have consisted of little more than marking time. We have already noted that for long periods a single clerk constituted the trustees' staff.

Until September 1949, the trustees had as their duly appointed attorneys two law firms, Bilder, Bilder and Kaufman and O'Mara, Conway and Schumann. Beginning in November, 1949 and continuously since then Samuel M. Coombs has been attorney for the trustees. As already indicated he served for a few months as both trustee and attorney. The Bilder and O'Mara firms

claimed 740 and 820 hours, respectively, of service to the estate. But more than 20% of this was time of members of both firms working together. Recently, in Coskery v. Roberts & Mander Corp., supra, 200 F.2d at page 155, we had occasion to disapprove double payment in such cases, saying, " * * * it is difficult to understand how four lawyers could advise with and act for the receivers without somewhat duplicating, or indeed quadruplicating, their services and their consequent claims for compensation." Next it is noted that throughout their employment by the trustees these attorneys were challenged by the Commission as ineligible because of previous representation of creditors of the debtor. And while disputing the Commission's claim the attorneys, in consideration of the ethics of the situation, restricted their representation to matters which in their judgment would not be questionable. This necessarily lessened the scope and hence the value of their service as counsel. Finally, and we think quite important, counsel spent some hundreds of hours in working out and attempting to justify a sale of debtors' assets without such a plan as is required in a Chapter X case. While we neither make nor imply any criticism for this mistake of law in a well intended effort to wind up the affairs of the debtor, we think that an insolvent estate should not have to pay counsel any substantial sum for legally incorrect procedure which was wholly abortive. The court awarded these attorneys $15,000. We think the amount should be reduced.

The major legal work for the trustees was performed by their attorney Samuel Coombs beginning November 1949 and thereafter. Mr. Coombs claims 3726 hours of service, has asked for $74,500, and was awarded $55,000. We think this is somewhat more than should be paid out of an estate in such condition as this one, especially when progress in legal matters has been very slow. Moreover, considerable time has been spent in connection with still pending suits and this is better evaluated and rewarded when these suits are terminated. Finally, several hundred hours seem to have been spent on matters for which we think the estate should not pay at all. This includes preparing and defending interim allowances desired by the trustees and their counsel and contesting all the way to the Supreme Court the efforts made to reduce the number of trustees. Recognizing that Mr. Coombs seems to have been the key and principal figure in the accomplishments since his first appointment as attorney late in 1949, we think his compensation as approved by the district court is higher than should be allowed in all the circumstances.

Normally, conclusions such as we have stated above would result in a remand to the district court to redetermine fees. However, we already have remanded the cause once for a reconsideration of this very order. The district court has made clear its view that no further taking of testimony or amplification of the record would be helpful to it in fixing fees. It is also relevant that most of the services in question were rendered before the judge now supervising the proceeding entered the picture. On the other hand the history of the proceeding has been such that this court has become very familiar with much of it. Moreover, the continuing movement of this cause between courts is taking time and costing money. All the parties are anxious for some decisive ruling, fixing or approving allowances in specific amounts.

In the circumstances we think it is proper and desirable that we fix the disputed allowances ourselves as the Court of Appeals for the Sixth Circuit did in the strikingly similar case of Fuller v. Memphis Street Ry. Co., 1940, 110 F.2d 577, 578. In rationalizing its unwillingness to send a fee matter back to the district court a second time and its decision to make specific allowances, the court said:

"It further appearing that great delay has already ensued in disposing of the petition for fees and expenses here involved; that no useful purpose would be served in again

remanding the case to the District Court; and that the usual considerations which make it inappropriate for this court to act as a court of original jurisdiction in fixing allowances for attorneys and committees in reorganization proceedings, and raise a presumption of soundness in the findings below, are not present since the services were rendered, the reorganization plan perfected, submitted to and approved by the court during the incumbency of a predecessor judge by reason of which this court is as fully advised as to the reasonable value of such services and the necessity for the expenditures, as is the court below, and as to whether or not they were of benefit to the debtor, * * * it is ordered * * *" [that specified fees be paid].

We are also helped by the fact that the Securities and Exchange Commission, in discharge of its public function and responsibility in this case has recommended specific allowances and has supported its recommendations as convincingly as restrictions imposed on proof permitted. The experience and resources of the Commission and its familiarity with this case as an active participant from the beginning are such that its reasoned opinion as to what allowances are fair and reasonable is a very useful and proper guide. Cf. In Matter of Detroit International Bridge Co., 6 Cir., 1940, 111 F.2d 235; Matter of Philadelphia & Reading Coal & Iron Co., D.C.E.D.Pa.1940, 61 F.Supp. 120.

Here the Commission recommended that McGirl, who already had received $30,000, be allowed an additional sum of $2,500; that Furst, who also had received $30,000, be allowed no further fee; that the firms Bilder, Bilder and Kaufman and O'Mara, Conway and Schumann jointly be allowed a fee of $10,000. We find no justification for larger awards and accordingly will direct that allowances to these persons be as recommended by the Commission.

For Coombs, who already had received $32,500, the Commission recom-mended an additional $7,500. We are convinced that although he carried major responsibility in this proceeding, his hours of useful work were not more than 3,500, probably less, and that $40,-000 compensation is as much as should be provided for him out of this so overburdened estate. Here too, we shall adopt the recommendation of the Commission.

Certain other small allowances must be reduced. The services of Honorable William T. Cahill, referee and special master in this proceeding, have been recognized in an allowance of $5,200, in his name for the benefit of appropriate public funds. None of this goes to the referee himself. However, the Commission showed at the hearing on allowances that, according to a policy proposed by the Commission and approved by the Bankruptcy Division of the Administrative Office of the United States Courts, a $10 an hour rate is now uniformly recommended for calculating these allowances. On this basis the Cahill allowance would be $2,600. Although we are now advised that no general agreement has been reached and that recommended rates vary, we are satisfied that the reduction of this allowance to $2,600 is in line with allowances approved in other Chapter X cases and, more important, is justified in all the circumstances of this case.

Another small item is the allowance of $2,400, to Joel L. Schlesinger, a well qualified real estate broker, for services in investigating property values and testifying on the matter as an expert appraiser for the trustees. Whatever Mr. Schlesinger's services might have been worth on a *quantum meruit*, he was employed on a different basis. An order entered by the court in this proceeding on January 25, 1951 recites that "for preparing himself to testify and then testifying for two days" Schlesinger shall receive not more than $500 with additional compensation at a rate not to exceed $150 for each additional day "his services are required in court." The claimant himself shows that he appeared in court only one entire day and parts

of three others. The Commission has argued that under the agreement and order of employment Mr. Schlesinger cannot lawfully be paid more than $750 for this service. We agree and will require that this allowance be reduced to $750.

The remaining reductions affect the allowances of Andrew B. Crummy and Isadore Glauberman, capable attorneys who separately represented different interested parties in this proceeding. There is no doubt that each of these gentlemen competently served those who retained him and was disposed to be as helpful as possible in this proceeding. However, this is irrelevant to the question of possible compensation to them from the estate. Such compensation, as distinguished from whatever other compensation their clients may provide, must be measured in terms of the benefit of their services to the estate and its administration. Unfortunately, the showing made in the record and at the hearing on allowances reveal this benefit as minimal. Their efforts were not of such value to the estate as to justify more than the very small allowances of $1,500 to Crummy and $750 to Glauberman recommended by the Commission. The larger allowances made by the court will be reduced accordingly.

We come now to the claims of Marion, Stavis and Unger and Endelman that they have been granted less than reasonable allowances for the benefits which have accrued to the estate through their efforts. We think they all played a substantial part in bringing into the estate $290,000 more than it would have had but for their efforts. On earlier appeal we remanded this matter to the district court seeking new light on their relative contributions. We think this much is clear. Stavis was responsible for and vigorously contested the successful appeal to this court from the order sanctioning a sale of assets for $525,000 which later were sold for $815,000. Unger and Endelman and also Marion played very important roles in bringing about the offer of $815,000 which was ultimately accepted. The district court rightly pointed out that the skill of the district judge in dealing with parties and proposals had much to do with the advantageous culmination of this transaction. But it was primarily the efforts of these claimants which created the opportunity for the judge to make effective use of his skill. In addition the appellant Stavis was the moving party and a diligent advocate in the appeal which resulted in the reduction of the number of trustees from two to one thus bringing about a more economical administration.

All of these services have been valuable to the estate. Some of them have been more than ordinarily difficult because they have required continuing opposition to particular efforts and proposals of the trustees and the contesting of orders which the court believed within its discretion. If on one or two occasions advocacy has become less than tactful, we think it has been well intended and, combined with other efforts, has meant many more dollars for creditors. We think creditors have no basis for complaint if ten percent of the $290,000 accession goes to these attorneys. That is almost exactly the aggregate of the allowances the Commission has recommended for them; $8,500 for Marion, $10,000 for Stavis, and $11,000 for Unger and Endelman. The district court reduced these amounts somewhat in making its allowances. But where services of this sort are rendered with compensation contingent upon success, we think even the 10% of the estate's gain which the Commission awarded these attorneys comes close to discouraging a type of often unpleasant and unpopular work which is a useful corrective of otherwise costly mistakes. Yet, except for one small item, we are unwilling, particularly in the absence of any satisfactory yardstick, to award larger fees than the Commission recommended or to make a different allocation among the claimants. The Commission with the interest of creditors foremost in mind has proposed rather small rewards for much useful work. But we are not satis-

fied that a better accommodation of interests would be served by any substantial revision. The one small revision we make is this. We are satisfied that the Commission's recommendation was based entirely or almost entirely upon the $290,000 gain to the estate. We think the reduction in the number of trustees also saved the estate money, although we cannot say just how much. In any event we add $1,000 to Stavis' allowance for valuable professional service in that connection. Accordingly, a fee of $8,500 shall be allowed to Marion; $11,000 to Stavis and $11,000 to Unger and Endelman.

Other allowances and disbursements appear in the order from which these appeals have been taken. We do not disturb them although some question has been raised about one or two. However, our technical disposition of the appeals will be a vacation of the entire order and a remand to the district court with instructions to enter a new order in which individual fees and disbursements shall be modified or remain unchanged as may be appropriate to reflect the conclusions stated in this opinion.